UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JULIE Z.[1], | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 1:21cv19 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|    Defendant. | ) |

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act

2

      through December 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since December 5, 2014, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.      The claimant has the following severe impairments: mild degenerative disc disease of the lumbar spine; migraine headaches; bipolar disorder; and anxiety (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.      After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except can occasionally climb stairs or ramps, stoop, or crouch; can never climb ladders, ropes, or scaffolds, kneel, crawl, or balance. With no concentrated exposure to moving machinery or unprotected heights. Work with a moderate level of noise, and not outdoors. With work that can be learned in 30 days, or less, with simple routine tasks; routine work place changes; and simple work-related decisions. No work that requires handling of money; and is able to remain on task in two-hour increments. With no interaction with the general public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 24, 1971 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from December 5, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 18-26).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on December 8, 2021.  On January 19, 2022 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on February 2, 2022**.** Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff's date last insured was December 31, 2014.  Plaintiff was born in 1971 and was 43 years old on her alleged onset date.  Plaintiff has a high school education and has past work as a fast food worker. Plaintiff has the following severe impairments: mild degenerative disc disease

4

of the lumbar spine; migraine headaches; bipolar disorder; and anxiety.

In support of remand, Plaintiff first argues that the ALJ erred by relying on a vocational expert (VE) who lacked a proper foundation or a solid basis for a substantial number of jobs Plaintiff could perform. At step five, the ALJ posed a hypothetical to VE Joseph Entwisle, to determine whether jobs existed nationally that Plaintiff could perform. (Tr. 61-62). The VE testified that given Plaintiff's age, education, work experience, and RFC, she would be able to perform the requirements of representative occupations such as mail clerk, DICOT 209.687-026, 1991 WL 671813 (68,300 jobs); stock clerk, DICOT 221.587-010, 1991 WL 672051 (251,400 jobs); and food prep worker, DICOT 316.684-014, 1991 WL 672744 (142,600 jobs). (Tr. 25, 62). Plaintiff objected to the job numbers on the grounds that the VE's methodology for determining job numbers was unreliable, but the ALJ overruled the objection. (Tr. 25, 65-68). At the hearing, Plaintiff's counsel questioned the VE about his methodology:.

> [Plaintiff's Atty] Q. Okay. This next question is quite important. I need you to concentrate. In relation to DOT titles within a SOC code, do you have any data that tells you what the ratio of the population within a DOT in a particular DOT title is to the total population in a SOC code? So in other words, is there any data out there that establishes the ratio?
>
> [VE] A. There is not a differential data that separates one DOT code from the others within the SOC code. Like, it's far from a perfect science, but again, it's the best data we've got.
>
> Q. I understand that, so essentially is the SOC code divided by the number of DOT titles within it to come up with new numbers?
>
> A. Well, the DOT codes that I used is a representative example. That's what I had stated earlier. Within that SOC cluster, I include all of the jobs, and all of the jobs listed within that SOC cluster fit the RFC, and again, if there's a number of those jobs that do not, I would provide a percentage reduction again using that same -- that same formula.

5

> Q. But the percentage reduction is not based on any data as reflected of ratios either? Is that correct?
>
> A. Well, it's based on the same data that the [Occupational Employment Quarterly] provides.
>
> Q. Okay.
>
> A. So again, it's consistent with the way they use the formula to provide that reduction.
>
> Q. The SOC code that we're talking about, does that contain mixtures of exertional levels and skill levels in relation to the DOT titles within them?
>
> A. Yes, they do.
>
> ATTY: Okay. All right. No further questions, Your Honor. I will object to the national numbers on the basis that they're the result of unreliable methodology and mainly because there are no active weight given the SOC code to the particular DOT title and essential information necessary to do that is the ration [sic] of the DOT title population of jobs to the SOC code and those are unknown not to mention the fact that there's a mix of exertional levels and skill levels jobs within the SOC codes, and those ratios are unknown also. Thank you, Your Honor.
>
> ALJ: All right. Your objection is noted and overruled and because we're running so late, the reasons for the overruling will be contained in the written decision.

(Tr. 67-68). In the decision, the ALJ held:

> The claimant's representative objected to these job numbers on the grounds the vocational expert's methodology for determining numbers of jobs is not reliable. The undersigned overrules this objection. The vocational expert has professional knowledge and experience in job placement. The use of vocational expert testimony, which is vital to many Step 4 and Step 5 determinations, is endorsed by the Social Security Regulations and Rulings. The Regulations provide that a vocational expert may be used at the discretion of an Administrative Law Judge to resolve various complex issues (20 CFR 404.1566). Social Security Ruling 83-12 expands further, stating that a vocational expert can assess the effect of any limitation on the range of work at issue (e.g., the potential occupational base); advise whether the impaired person's residual functional capacity permits him or her to perform substantial numbers of occupations within the range of work at issue; identify jobs which are within the residual functional capacity, if they exist; and provide a statement of the incidence of such jobs.

6

> Vocational experts, in offering their testimony, may rely on a number of sources. The Regulations provide that when we determine jobs exist in the national economy (in significant numbers), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of the Dictionary of Occupational Titles, published by the Department of Labor; County Business Patterns, published by the Bureau of the Census; Census Reports, also published by the Bureau of the Census; Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and Occupational Outlook Handbook, published by the Bureau of Labor Statistics (20 CFR 404.1566).
>
> Together, these expressly provide that vocational expert testimony may be used to identify occupations that are within the residual functional capacity and provide testimony regarding the number of jobs that are available in the local, regional, or national economies.
>
> The Regulations do not entertain that a vocational expert must also be a statistician.
>
> The vocational expert retained in this matter is a highly skilled and qualified individual (B19E). The curriculum vitae reflected in the file demonstrates that he has considerable experience. Moreover, the argument the sources relied upon are unreliable is rejected. The vocational expert in this matter relied on one or more of the publications identified by Section 404.1566. The Act sets forth these are "reliable" sources of which administrative notice shall be taken.
>
> In sum, the objections raised at the hearing regarding this testimony are overruled. Accordingly, the vocational expert's job information is found to be reliable.

(Tr. 25-26). While the ALJ's exposition is interesting, it sheds no light on the issue before her. The ALJ couches her reasoning in generalized terms and doesn't explain why she overruled Plaintiff's objection to the VE testimony in this case. Even if the publications relied upon by the VE are in themselves deemed reliable, the VE did not solely rely on the publications but extrapolated his data from one publication to another and then reduced the number of jobs by ratios/percentages that he felt were correct.  In her ruling, the ALJ did not explain why Plaintiff's objection to this method of determining job numbers was overruled, or how the VE's method was

7

reliable.

Plaintiff argues that the VE could not provide a reasoned, reliable statement of the methodology to move from the broader SOC categories to the narrower DOT categories, and that the VE failed to adequately explain the allocation formula rendering it incapable of being reviewed by the Court.

The Commissioner claims that the VE explained in detail the allocation formula he used, explaining that he is able to divide up a broad SOC code into individual jobs based on their individual demands:

> [the program] uses the basic algorithm of long division to divide up the labor and equitable jobs based on those SOC clusters. I used a representative example from each of those SOC clusters being cognizant of the other titles that are within that cluster to make sure that they fit okay.

(Tr. 66). Then, depending on the limitations in the hypothetical, the VE explained that he would reduce his estimate by an "appropriate percentage":

> For example, if you had someone who was maybe at light in the general office parks [PHONETIC] has a large subset of jobs that do not require interaction with others that certainly could be done at the unskilled level, but I would reduce a portion of those jobs at 10 percent because there's about 10 percent of those jobs, based on the full SOC cluster that require an interaction certainly less than an 8 in the data others and things [PHONETIC] category of the DOT code . . . I tried to focus on jobs where I'm fairly cognizant of what is in those clusters knowing that if they're light, as I referenced to earlier, if there are jobs within that cluster that maybe are outside the purview of the RFC, I would provide a reduction of a certain percentage of those jobs using the data in some basic form like the OEQ uses to reduce those numbers . . .

(Tr. 65-67). Yet, it is still entirely unclear how the VE arrived at his percentages/ratios to reduce the broad (and apparently incorrect) job numbers to include only those that Plaintiff could perform.

8

In *Ruenger v. Kijakazi*, 2022 WL 134748 (7th Cir. Jan. 14, 2022), the Seventh Circuit noted that *Biestek v. Berryhill*, 139 S.Ct. 1148, 1155 (2019), held that VE testimony meets the substantial evidence threshold when the VE "cogently and thoroughly" describes a well-accepted methodology. In *Ruenger*, Judge Scudder, in a concurring opinion, stated that: "No matter how many times we read [the VE's] testimony, we cannot discern the VE's methodology.  To be sure, we recognize many of the VE's references and much of the related administrative lingo.  But recognizing dots does not tell us how, if at all, they connect.  Faced with a transcript like this one judicial review is an exercise in futility." *Id* at 11.

As in *Ruenger*, the VE testimony here is far from "cogent and thorough" and fails to connect the dots such that the Court can ascertain that the VE's job numbers are reliable.  Thus, as substantial evidence does not support the ALJ's conclusion that there are a significant numbers of jobs in the national economy that Plaintiff can perform, remand is necessary.[2]

Next, Plaintiff argues that the ALJ erred in the RFC analysis. At step three of the sequential evaluation process, the ALJ determines whether Plaintiff's impairments meet or medically equal a listing. *See* 20 C.F.R. §§ 404.1520(c), (d), 404.1525, 404.1526. Using the "special technique" for evaluating mental impairments, the ALJ assigns ratings in four broad functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(E). Three of the four broad functional areas are

---

[2] Plaintiff also raises the point, in a footnote, that the VE was using 2019 data, as the hearing was held in July of 2020. (Tr. 65). Plaintiff contends that the VE should have used 2014 data, as the Plaintiff's insured status ended on December 31, 2014.  This Court disagrees.  The VE (and the ALJ) must provide evidence that there are a substantial number of jobs that Plaintiff "can perform", not whether there were jobs she "could have performed" years ago.

disjunctive, and "the greatest degree of limitation of any part of the area of mental functioning directs the rating of limitation of that whole area of mental functioning." *Id.*, § 12.00(F)(3)(f); 81 Fed. Reg. 66157. For example, if a claimant has no difficulties in concentrating, mild difficulties in persisting, and moderate difficulties in maintaining pace, she will be categorized as having moderate difficulties in the area of concentrating, persisting, or maintaining pace. 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(F)(3)(f).

Here, the ALJ determined that Plaintiff had moderate limitations concentrating, persisting, or maintaining pace (Tr. 19). And, as Plaintiff admits, there was "not [] enough to justify a 'listing' finding under the 'B' criteria". However, relying on *Yurt v. Colvin*, Plaintiff contends that the ALJ's hypothetical and RFC did not account for her moderate limitations in her ability to concentrate, persist, or maintain pace. 758 F.3d 850 (7th Cir. 2014). Specifically, Plaintiff asserts that the ALJ's RFC limiting her to "simple tasks/decisions, and to routine changes in [the] work setting" was insufficient under *Yurt* to account for her moderate limitations concentrating, persisting, or maintaining pace.

In assessing Plaintiff's limitations concentrating, persisting, or maintaining pace, the ALJ acknowledged that Plaintiff reported side effects from her medications and during a consultative examination in May 2019, more than four years after her date last insured, the examiner determined that her concentration was significantly below normal. (Tr. 19, 21, 48, 527, 1324). However, the ALJ also noted that during the period at issue (*i.e.* June 2014), when Plaintiff reported symptoms such as "zaps," nausea, and dizziness, she admitted that she had not taken her

10

medication in at least four days.³ (Tr. 19, 1324). Additionally, the ALJ discussed other evidence showing that Plaintiff did not experience any more than moderate limitations in her ability to concentrate, persist, or maintain pace. The ALJ assessed evidence showing that Plaintiff was able to obtain and maintain a driver's license, and during her May 2019 consultative examination, she was able to count backward from 20 by ones and recall two of three words after five minutes. (Tr. 19, 45, 526-27). Plaintiff was able to live independently and reported driving daily during the relevant period. (Tr. 20, 44-45). The ALJ also highlighted that although Plaintiff admitted that she did not remember a lot of what was going on during the period at issue, she testified that she was taking medications for her mental impairments and she found them effective. (Tr. 21, 47-48). While Plaintiff alleged that she had difficulty handling money, the ALJ discussed that notes in the record indicate that she also acknowledged that she was indeed able to handle money. (Tr. 19, 345). As the ALJ explained, Plaintiff received "minimal mental health treatment" during the relevant period, and while she was taking psychotropic medication, there was no indication that she was receiving regular counseling or therapy, she did not receive any inpatient mental health treatment, or require crisis intervention, and she admitted to being out of medication for several days during the brief period at issue. (Tr. 22, 1324). Accordingly, the ALJ determined that Plaintiff had no more than moderate difficulties concentrating, persisting, or maintaining pace, and thus determined that although she cannot perform "work that requires handling of money,"

---

³ Plaintiff argues that "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference." (Reply Brief at 1-2). Here, however, the ALJ was not weighing Plaintiff's credibility, but noting that Plaintiff's temporary problems with "zaps", nausea and dizziness were likely caused by the fact that Plaintiff had been out of medication for four days. (Tr, 19).

11

she could perform work that could "be learned in 30 days, or less, with simple routine tasks; routine work place changes; and simple work-related decisions," where she "is able to remain on task in two-hour increments" (Tr 20).

Plaintiff suggests that an RFC for simple, routine, and repetitive tasks can never adequately capture a moderate limitation in concentration, persistence, or pace; but the Seventh Circuit has not established a per se rule. In fact, the court "will uphold even 'generic[]' limitations so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Saunders v. Saul*, 777 Fed. App'x 821, 825-826 (7th Cir. 2019) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Specifically, "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations" in concentrating, persisting, or maintaining pace. *Urbanek v. Saul*, 796 Fed. App'x 910, 914 (7th Cir. 2019).

In this case, the ALJ incorporated all of Plaintiff's limitations into the hypothetical question and went beyond, limiting her to unskilled work, by including specific restrictions on learning, judgment, changes, adaptation, and interaction. (Tr. 20, 61-62). Thus, the ALJ's hypothetical to the VE, derived from the RFC, "captured" Plaintiff's moderate difficulties by limiting her focus to simple and routine tasks, simple work-related decisions, routine changes, and no interaction with the general public. (Tr. 20). For moderate difficulties regarding concentration, persistence, or pace, the Seventh Circuit has upheld limitations similar to those in the present case. *See Dudley v. Berryhill*, 773 Fed. App'x 838, 842 (7th Cir. 2019) (a limitation to simple judgment "specifically accounts for . . . concentration difficulties"); *Pytlewski v. Saul*, No. 18-3673, 2019 WL 5884542, at *3 (7th Cir. Nov. 12, 2019) (upholding an RFC for simple,

12

routine, repetitive tasks and simple, work-related decisions because it was supported by the State agency doctors' narrative and checklist assessments).Accordingly, substantial evidence supports the ALJ's finding that Plaintiff was limited to no more than moderate limitations in her ability to concentrate, persist, or maintain pace and there is no basis for remand on this issue.

Plaintiff also asserts that the ALJ erred in not including limitations for interacting with others in the RFC. The ALJ found that Plaintiff had moderate limitations in her ability to interact with others. (Tr. 19). While Plaintiff admits that her social interaction limitations did not rise to listing level severity and that the ALJ accommodated her problems interacting with the public, she contends that the RFC does not account for her problems interacting with supervisors and coworkers. (Tr. 19). However, Plaintiff cites no evidence that would support limitations on her ability to interact with supervisors and coworkers, other than noting that the ALJ assigned moderate limitations on interacting with others because a room full of people triggers her vertigo and migraines. (Tr. 19). Plaintiff claims that "the ALJ's RFC effectively places her in such a room daily." (Opening Brief at 12). However, the jobs identified by the VE (mail clerk, stock clerk, and food prep worker), would not take place in a room full of people. Rather, Plaintiff would be expected to interact with a few people (co-workers and supervisors) on a limited basis.

The ALJ explained why the evidence supported Plaintiff's moderate limitations interacting with others and the corresponding RFC limitations. The ALJ acknowledged Plaintiff's testimony that a room full of people could trigger her vertigo and migraines and that she indicated in her function report that she has difficulty getting along with others. (Tr. 19, 52, 347). However, the ALJ explained that during the relevant period, Plaintiff's examinations revealed that she was responsive and cooperative, and she admitted that she tries to get along with people. (Tr. 19, 348,

13

527, 1325, 1332, 1347, 1361, 1381, 1399, 1410, 1430). Plaintiff also admitted that she had never been terminated from a job because of problems getting along with others. (Tr. 19, 348). Based on this evidence, the ALJ limited Plaintiff to no more than moderate limitations in her ability to interact with others and determined that she could have no interaction with the public. As this determination is supported by substantial evidence, remand is not warranted on this issue.

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: February 14, 2022.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court